The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zienoff presiding. Good morning. This is case number 4-25-052, People of the State of Illinois v. Kevin Moon. Would counsel for the appellant identify yourself for the record, please? Yes, good morning. My name is Haley Yussman. I am counsel for Appellant Kevin Moon. Thank you. And would counsel for Appley identify yourself, please? Thank you, Your Honor. David Robinson from the Appellate Prosecutor's Office with 7-11 student Alan Kennedy from our legal clinic at the U of I College of Law. And Mr. Kennedy will be arguing this morning, is that correct? Yes, Your Honor. Thank you. All right, Ms. Yussman, you may begin your argument. Thank you. Good morning. Your Honor, may it please the court, again, my name is Haley Yussman for Appellant Kevin Moon. Our argument today has three parts. First, we are asking you to find that the trial judge erred and prejudiced the jury when he allowed the state to show them video footage of Kevin Moon dancing and rapping with the alleged murder weapon. We are also asking you to find that the trial judge erred by allowing the lead detective to sit with the state at their table throughout trial. Finally, we will be arguing that Moon's trial attorney provided constitutionally ineffective assistance when he blatantly failed to object as the state impeached its own non-hostile witness on direct examination. Turning to our first issue, the judge committed an egregious error when he let the jury watch a video of Kevin Moon dancing and rapping alongside the alleged murder weapon. Such blatantly prejudicial video footage almost certainly invoked implicit gang associations and was not necessary to show access to or comfortability with the weapon. Counsel, good morning. I have a If we watch and listen to this video, really the lyrics to the song that is played on this video are virtually indecipherable from the video. What do you contend are the lyrics that you believe were either violent or related to gang membership? Certainly. So our argument is not based on the lyrics itself. Rather, our argument is based on the optics of the rap music and mouthing of lyrics even if those lyrics are not discernible alongside of dancing with the weapon alongside to that rap music. So our argument is that those actions conjured up implicit gang associations. Now, let me just understand. You're saying which actions conjured up gang associations? Yes. So the fact that there is rap music playing in the background, first of all, even if the lyrics are not and that combined with the fact that K'von Moon was dancing along to the music, waving around the weapon, and mouthing the lyrics. So you're saying rap music and a gun conjures gang membership? Not that it conjures gang membership, but that it can conjure implicit bias in which people associate that with gang membership and then believe based on that that that person is more likely to be morally corrupt or to act in a Well, if we look at this video a little more closely, it was created, we know, two days before the shooting incident in this case and James can be heard referencing twin guns, twin glocks, and we know that they both repeated the word the defendant did also, glock, and the defendant said something about a lot of headshots. So we're not talking about the lyrics here or the music, but wouldn't those relevant comments have been lost to the jury if the court had prohibited the state from playing the video with the audio? Because we know that there was an association of the guns that were used, they were similar to glocks, if not glocks, with what was stated by the two on the video. So to that point, I would say even if evidence is irrelevant, it does need to be considered whether it would be unduly prejudicial at the same time. So here, the facts that you're talking about, the fact that he knew what type of gun it was, that he was holding it and had access to it, that all was also separately adduced through detective testimony at other points in the trial. Showing this particular video footage was not necessary in order for the state to prove up that information. And even the judge himself recognized on the record, he said, you know, videos such as these, they can conjure up gang affiliations, and yet he allowed the jury to watch the entire video without any redactions. And so... Oh, I believe there was a redaction, was there not, unless I misunderstood. The cash, the part of it that had cash that was flashed, that was redacted. Yes, that is, to my belief, a separate video, like a separate exhibit from the state. So this particular video that I am referencing was shown in its entirety. I see. Yes, it is the video where he was dancing and rapping alongside. So the judge did consider requests to redact all of it, but then only redacted that one part and did not provide an explanation why, as to why he did not redact this other part. And our standard of review here is abusive discretion, correct? Yes, that is correct. So because, in particular, because the judge did acknowledge on the record that videos with these elements could conjure up associations with gangs or bring about implicit biases, and then still proceeded to allow the jury to watch this exhibit in its entirety, we are arguing that the judge abused his discretion. And then let me just ask one other question. Your argument is based on the premise that jurors are inherently biased against rap music, but this specific argument was not made in the trial court. That wasn't the basis of the objection, and the trial court did not have the opportunity to rule specifically with respect to that. And now you're introducing or asking us to consider articles that the trial court didn't have in front of it, didn't have the opportunity to read, to establish a premise that, as I said, the trial court didn't even have a chance to look at. How is it improper? Sure, understood, Your Honor. So I think it's important to differentiate here what our purpose in citing to the articles is. So our argument itself is that elucidating gang bias is improper, that implicit bias can unduly prejudice the jury, especially when associated with gang affiliations. Now, our cites to the articles are not to be used as evidence outside the record. Rather, they are to elucidate and define a concept or word that we use in our argument, that being implicit bias. That concept was already talked about at the lower level when trial counsel made its objections because of the possibility of gang bias. So our references to these articles are to better elucidate and define that concept that is central to our argument, not to bring in outside evidence. Our argument itself is fully supported by cites to the record and to case law. So, again, in a case such as this one, where no eyewitnesses were able to identify the shooter, where there is no DNA, physical evidence necessarily linking Moon to the crime, this improper evidence almost certainly influenced the jury's ultimate conclusions. Turning to our second issue. Now, Jill, I'm going to ask if you don't mind that we actually turn to the third issue. There's not a lot of time for oral argument, as you know, and this issue of prior and consistent statements, I think, is a very important issue. Not that the other one isn't, but I want to be sure we have enough time. Certainly. And I do have a question with respect to what your argument is. You do seem to argue that having the court, a trial court, recognize that a state's witness is hostile is necessary to the state impeaching its own witness with a prior inconsistent statement. But my question is, how do you reconcile that with Supreme Court Rule 238A, which we know is applicable to criminal cases by way of 433. And 238A says the credibility of a witness may be attacked by any party, including the party calling the witness. Right. Well, I read Rule 238A as it's supposed to be taken in tandem with this explanatory case law, which expounds on it and says that, you know, a witness does need to be deemed hostile. And that is typically followed in cases where the state wishes to essentially go into an attack on direct examination. And here, there was no such sidebar that we typically see, where the state, you know, takes all the parties aside. It's off the record. Well, not off the record, but off the record for the jury. The jury does not hear the conversation. And the parties discuss with the judge whether this can be qualified as a hostile witness. And those typical proceedings just didn't occur in this case. And that allows, I'm sorry. Go ahead, Judge. No, please. It's your line of questioning. I'll wait. That allows, the purpose of that is to allow cross-examination, right? It's how the witness is examined, not whether the witness is examined. Yes, yes. Correct. Okay. I'm sorry, Justice Kavanaugh. Go ahead. Thank you. Counsel, you argue that the rule is to be taken with the context of the case law, sort of a work together is in tandem. Any of the case law that you're aware of say that, in fact, this rule must be supplemented or used with the actual case law? Um, no, I'm not aware of any case law that specifically says that the rule must be supplemented or taken in tandem with the case law. I'm just commenting on how rules are typically constructed in the state of Illinois, to the best of my understanding, when there is explanatory case law that talks about a rule and delves deeper into its meaning. And when there tends to be a specific practice around how a rule is understood in Illinois, that is what our argument centers on here. Thank you. Of course. And then also with respect to your argument, I believe you're arguing that there has to be a showing of affirmative damage. Yes. Okay. And as I read Illinois rule of evidence 607, it does say the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement, only upon a showing of affirmative damage. But there is an exemption. Is there not an exception when the statements are admitted pursuant to rule 801 D1A, which in essence says that, and refers to prior inconsistent statements that are admitted as substantive evidence. So, and even in your reply brief, you assert that affirmative, this affirmative damage requirement applies even when the prior inconsistent statement is otherwise admissible as substantive evidence. Doesn't that argument, and well, really how do you square that argument, for example, with what Graham's handbook on evidence says at 607.4 page 534. And it says, and I'm quoting affirmative damage, of course, need not be established when the prior inconsistent statement is admissible as substantive evidence. Now you mean you agree that these statements were admitted as substantive evidence, correct? Right. Correct. Yes. So how do you square it? Right. So just because the statements were properly admitted as substantive evidence in terms of the video footage does not mean that they were properly admitted as substantive evidence while Gales was on the stand. In order to impeach him and get those admitted at that point, the state would still need to follow the proper protocol. And so, yes, they were properly admitted in the video footage and the jury properly considered as substantive evidence those statements that were made and shown in the video footage. But because the course of impeachment did not follow proper protocol, even if the statements are otherwise admissible, then that simply was error in the trial proceedings. Well, when you're saying proper protocol, the proper protocol is you confront the witness with the statement as you're examining the witness, do you not? And only if they deny making the statement, then you can go further. Right. That's step one, is it not? You certainly have to have a foundation in order to introduce the video. So the state has both obligations, correct? Certainly, which goes back to our other point about, again, how the state never had him deemed a hostile witness in the first place. So there was no protocol to either have him deemed a hostile witness. Do you have a question, Your Honor? No, I'm listening. Go ahead. Sorry, I thought I heard something. So, yes, there was, first of all, no protocol followed to have him declared a hostile witness or to make any showing that there had been any affirmative damage in the state's case. So just any of the prerequisites that typically occur prior to this essentially cross-examination on direct were not present here. Well, are you aware, maybe, can you give this court any authority expressly stating that the affirmative damage requirement does apply when the prior inconsistent statements do come in as substantive evidence and meet the requirements of the Rule 801 D1A and also 115-10.1? What Right. So I don't believe there's any authority that deals with this particular scenario and says that exactly. Rather, it is our construction of the existing authority and what is practiced throughout the state of Illinois in conjunction with these particular factual circumstances. That is what our argument hinges on, that because the protocols were not followed here, then the resulting impeachment of Gales on the stand was improper and that those answers should have been elicited even if they were elicited through proper means otherwise. And you're, I'm sorry, you're referring to protocols. I'm not familiar with what protocols are you referring to based on what? Yes, just typically what occurs in cases throughout Illinois, such as having that conversation outside of the presence of the jury to see whether this witness will be declared hostile, to see whether this is a line that is going to be taken, giving defense counsel a chance to object, to see, you know, have, has this witness actually been sufficiently affirmatively damaging? Does this evidence count as, is this something that can be admissible and having that conversation off the record before turning to this particular course? Counsel, are you suggesting that we follow what might be typically done in trial courts that are, that's not laid out either by statute or case law, as opposed to reading this rule and the exceptions that Justice Zinoff pointed out earlier and applying what, you know, what we can read with our own eyes? No, I certainly, you know, I don't suggest ignoring the rule, but nothing in the rule precludes this practice. So I'm saying that the evidence throughout these cases shows what is considered to be best practice in the state of Illinois, and that's read in conjunction with this rule. It would be different if the rule had some sort of very specific practice or prohibited these types of proceedings, but instead the rule leaves it more open-ended and what has occurred in the state of Illinois has sort of set the stage for what is expected at trial. Thank you. Maybe now would be a good time to turn to your third issue, so we're sure we have time for all of that. And with respect to the third issue, I guess getting right to it, you ask us to reject fourth district case, People v. Chapman, and adopt the reasoning of a decision from a foreign jurisdiction, the Sampson case, that preceded Chapman by nine years. My question is, how is that consistent with the principles of stare decisis? And with the adoption of Illinois Rule of Evidence 615, do you believe that abrogated all of the body of case law that came before it? Certainly. So turning to, I'll start with the second part of your question, not that it necessarily abrogated all of that case law, but that case law was relevant at a time when Rule 615 said something different. So now that Rule 615 has evolved to essentially codify this growing consensus that a lead detective should not be allowed to sit with the state throughout trial, that case law does need to be eyed with that in mind. It's not that it shouldn't be looked at or shouldn't be considered, but there does need to be a consideration of the fact that the rule has since changed and that a lot of this case law relies both on an old rule and opinions that predate the rule change. And so more on this issue. The prosecution here never claimed that the lead detective's presence was essential. Is there magic language with respect to that? Did that actually have to happen? I mean, there is another part of the rule, the exception, where certainly the state could designate a law enforcement officer as its representative. I know it's a two-part question, but... Sure, sure. Certainly they could, and I know that Chatham does talk about that. However, in the committee notes that Chatham actually cites itself, it indicates that that portion is applicable, that it is applicable to designate someone as a representative when it is extremely important. That is the language that is used. Extremely important to the presentation of the state's case. And here, no, there's not necessarily magic language, but the only language that was used was helpful. Helpful is very different than necessary or extremely important or essential, which are the words that are used in the statute and the committee notes explaining it. So here, the state, again, only alleged that the lead detective's presence would be helpful and there was nothing else adduced that would say otherwise at trial. So the state did not meet its burden under our understanding of that rule to have the detective sit there. And I see that I am out of time, so unless your honors have any further questions, I will wait until rebuttal. Great. Justice Kavanaugh, any further questions now, or Justice Vancel? Okay, you will have time for rebuttal. Thank you very much. Thank you. Mr. Kennedy? Good morning. May it please the court, opposing counsel, my name is Alan Kennedy, appearing under Illinois Supreme Court Rule 711 under the supervision of David Robinson, the state's attorney's appellate prosecutor's office, on behalf of the people. Your honors, this is a case about the proper use of discretion, whether that be the discretion of trial defense counsel in choosing not to object to a series of impeachments, or the trial court's discretion in choosing to allow the admission of certain exhibits, or whether to allow the lead detective to sit at counsel table. In all of these situations, this discretion was used reasonably and appropriately. With respect to, good morning, counsel, with respect to the issue of prior inconsistent statements, and opposing counsel's argument that there was never a declaration that witness Gales was declared hostile, and the trial court erred then by allowing the state to go forward. Is that necessary to whether the state could introduce these prior inconsistent statements? No, your honor, not in this situation. So, defendant, in arguing that the rules of evidence required a declaration that Alexander Gales was hostile in order to impeach him on direct examination, ignores flat out the existence of 725 ILCS 5-115-10.1, which was the process by which the state elicited and offered these statements as substantive evidence. And from reviewing the record, it becomes clear that this is the case. When Gales was originally called, they brought him in outside the presence of the jury. And at that point, it seems, although they never explicitly said so on the record, that the state was attempting to have an acknowledgment hearing under subsection C-2B of 5-115-10.1. At that point, they went through an offer of proof in the form of a question and answer with Gales. Gales, he refused to acknowledge his prior statements, and so the acknowledgment hearing in that sense failed. At that point, the state kind of had to pivot and during their direct examination, once the jury was actually present, they switched to eliciting the statements under subsection C-2C. And we would admit that or acknowledge that the state failed to provide the necessary foundation at the time the statements were elicited for subsection C-2C, that the statements were coming from an actual video recording. But they laid that foundation later by admitting the actual video recording. And although it's absent in defendant's brief, the state also prefaced the first of these prior inconsistent statement impeachments by reciting to Gales that these statements they were impeaching him with were coming from a video recorded interview with the Bloomington Police Department. Well, is there also — I'm sorry, go ahead and finish. No, please, Your Honor. Is there also a requirement, as opposing counsel suggests, that there be affirmative damage to the case before these statements could be admitted? And indeed, is affirmative damage just saying, I don't recall, I don't remember, as was done here? Your Honor, when eliciting statements under section 115-10.1, there's no affirmative damage requirement. And I remember Your Honor asked opposing counsel about this. We do have case that this is the case. Pointing to People v. Venote, a 2012 4th District case that stands for the point that a witness's statements don't have to be contradictory or damaging in order to be inconsistent for the purposes of section 115-10.1. It goes on to say that inconsistency can be found in evasive answers, silence, or even just changes in opinion. It's also worth noting that People v. Venote was quoting People v. Flores, an Illinois Supreme Court case from 1989, that goes even further, saying that when a witness now claims not to remember something that they formerly affirmed, that former affirmation should be admitted as a contradiction. And these statements were admitted for impeachment, or were they admitted as substantive evidence? They were admitted as substantive evidence under section 115-10.1, Your Honor. And you argue it in your brief at page 11. In fact, I'm going to quote, rather than impeach Gales with his prior statements to show the jury that Gales was being untruthful, the state properly admitted each of the statements at issue as substantive evidence under section 115-10.1. Counsel, can you let me know, there's no record citation there, where in the record were these statements admitted as substantive evidence by the court? And where was there a request to admit them as substantive evidence by the state? Your Honor, based on my reading of the record, I don't believe the state ever formally asked that these specific statements be offered as substantive evidence. Rather, they were brought into the record without objection. And then later on in argument, the facts that these were proving were argued. There is a bit of space in the record as to why trial defense counsel did not object. But it would be reasonable to infer from the situation where the acknowledgment hearing was attempted, and then there were several recesses throughout the course of trial, that defense counsel and the state had spoken about this issue, and that defense counsel understood that the state was bringing these in under section 115-10.1. And that even though the necessary foundation wasn't laid at the time statements were brought into the record, that foundation would be laid later, and it was laid later by admitting States Exhibit 74, which was the recording of these statements. So how is a foundation, how do you lay a foundation? What should the state have done? What are you suggesting the state should have done? Well, Your Honor, I'm suggesting that the state did the best possible thing here in this case by going through and using section 115-10.1 and shoring up the gap in the foundation. Sorry, I should, I'll make this clear. At the time the statements were elicited in the direct examination of Gail's, the state had not actually brought in the substantive proof that the statements were video recorded. They asked Gail's- Well, Sarah, but I'm just, how would there, and I understand you're a 7-11 student and you have not practiced for any length of time in a courtroom, but respectfully, there's no need for any of that to come in unless there's a denial. You have to confront the witness first. I mean, that's how this happens, at least in my experience as a trial judge. That's what comes first, and then if there's a denial, then there's a reason to introduce the video, and then, of course, you have to have the foundation to do that. My experience hasn't involved flipping the order. I mean, I'm just, I don't know what tells us or what we should be looking at as an appellate court to see if this trial court erred, and you're suggesting there's a, quote, gap, and the state should have done something different, so I just wanted to ask you, what should have been done differently? Well, Your Honor, as I was, my understanding of the way, I guess, evidence generally worked was that in order to bring in a piece of evidence, every part of the foundation board had to be laid and, as I seem to understand from Your Honor's question, did not exist, there was no deficiency. The fact that these statements were coming from a recorded, or that the statements were accurately recorded by a videotape recording was brought in later during trial as states exhibit number 74. Thank you. Why don't we move on? I know there are other issues to address. Go ahead. Thank you. Yes, Your Honor. Turning towards the issue about the exhibit concerning rap music in the background, I believe Your Honor asked a question about the relevant comments that the defendant, as well as his co-defendant, made in the video being lost if the video had been redacted or otherwise altered to remove the rap music, and I think that hits the nail exactly on the head. The audio of this particular exhibit establishes that defendant was aware of the weapon he was holding. It helps to identify that the weapons in the video match the weapons that are depicted in other exhibits, and it establishes that the defendant was familiar with this weapon, that he had possession of it, and that he had the necessary comfort level with those particular weapons to be capable of using them in the charged offense. When it comes to the actual music itself, we agree that the lyrics are practically indecipherable. The opposing counsel argued that that didn't matter, that really what was objectionable and prejudicial was the fact that it was rap music and guns, and if I understood her argument, how do you respond to that, that that's where the prejudice was, and that the secondary sources that trial court didn't consider but didn't have to consider established that? Well, Your Honor, we disagree that the mere presence of rap music leads jurors to an implicit bias that necessarily would prejudice the defendant. When it came to the trial court's decision to allow these exhibits to be admitted, the court, frankly, considered all of these things in the motions, in the hearing on the motion in Lemonet, and it bears noting that the state's motion in Lemonet included a great deal more evidence that was not allowed into the trial and that the jury never saw. As Your Honor noted before, that there were exhibits that depicted cash and other images or things that would suggest a connection to gang violence in this case, and the trial court refused to allow those exhibits into evidence. Instead, what was allowed are a limited number of videos that prove the defendant had both possession and access to the murder weapon. For those reasons, the court reasonably used their discretion. The court considered the potential bias and prejudice that could result from these exhibits, and in his discretion, deemed the mere presence of rap music acceptable. When it comes to considering these secondary sources relating to implicit bias and its connection to rap music, we believe that it would be inappropriate for the court to consider this when it wasn't available to the trial court, and I would note that this court has repeatedly refused to consider secondary sources that were not available to the trial court in situations like this, notably in People v. Colon. I'm sorry, that was a First District case, but I'm sorry, I mixed up my cases. People v. O'Neill was the Fourth District case I was trying to think of, but this court need not consider those secondary sources to the extent that it would. We believe that it would not change the situation that the trial court appropriately used their discretion in considering the potential bias and prejudice that these exhibits would have on the jury, and for those reasons, the exhibits are unproblematic. Turning towards the issue of the lead detective being allowed to sit at the state's council table, again, the court used its discretion properly. Well, did the state meet the requirements of the rule which referred to the role of the person sitting at council table be essential? Did they ever indicate that versus helpful, and does that matter? Well, Your Honor, in your questions for opposing counsel, I noted you asked about whether any magic language was necessary, and I don't believe it is. Rather, the state made clear through other means that the lead detective's presence at council table would be essential. They pointed out that there were thousands of pages of documents in this case, that there were hundreds of hours of video, and made clear without saying the word essential that this lead detective's presence at council table would be essential to presenting their case. To the extent that the trial court considered whether the detective's presence at council table would lend undue credibility to his testimony later at trial or unduly bolster or allow him to change his testimony based off of the testimony of other witnesses that he got to watch while sitting at council table, Your Honor, the trial court considered those factors in coming to its decision during the hearing on the motion in Lemonet, and within their discretion, determined that those were acceptable and minor risks that would be outweighed by the value of having this detective sit at council table and assist the state in presenting their case. Mr. Kennedy, the defendant cites a case from the Supreme Court of Kansas, the Sampson case, that categorically, as I read it, prohibits to testifying law enforcement officers from sitting at council table and hearing other witnesses' testimony. Maybe tell us why we shouldn't deem that decision persuasive here. Well, Your Honor, we would emphasize that as recently as 2022 in People v. Chapman, this court has decided that Illinois continues to find it acceptable for a lead detective to sit at council table, and absent any major change of will coming from the General Assembly, it would be appropriate to continue, as Illinois has for many, many years, in accepting the relatively minor risk of a lead detective gaining extra credibility from being seated with the prosecution, which stands to reason that a police officer is almost always to be working with the government. A reasonable jury wouldn't necessarily have their opinion of his testimony affected very much by his being at council table. Well, they aren't law enforcement, but if this law enforcement officer is going to later testify, don't juries perhaps sometimes look at law enforcement officers as perhaps more credible than others? Why wouldn't the defendant have been prejudiced by Klein's presence at the council table throughout the entire trial? And I know your time's up, but I asked the question, so if you want to just give the answer, please. Thank you, Your Honor. Your Honor, this is something that comes up during I think every jury trial that happens in Illinois that might involve the testimony of a police officer. The jurors are asked and admonished about whether they would consider the testimony of a police officer any differently from any other witness, and so they're on notice, for lack of a better term, that they should treat a police officer's testimony in that same manner. And for that reason, along with the reasons argued both here and in my brief, we ask that this court affirm. Thank you very much. All right, Ms. Yasmin, you have a chance for rebuttal at this time. Thank you, Your Honor. Yes, briefly in response to the state's arguments, so first turning to the issue of impeachment on direct. When you asked the about the situation, the fact that Gales was not declared a hostile witness, the state turned to talk about the fact that an acknowledgment hearing was held outside the presence of the jury. However, an acknowledgment hearing is not a replacement for an on-the-record statement that a witness has been declared hostile. Those are two separate proceedings. You also asked about what was missing in terms of at the point in time when Gales was impeached, getting his statements admitted as substantive evidence, and the state was unsure, but I can identify exactly here what was missing, turning to section 115.10.1 as the state was referring to. One of the prerequisites to have a prior inconsistent statement admitted as substantive evidence, point C, the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording. At this point in time, as was adduced through both my words today and the state's, at the time that Gales was impeached, no video footage had been introduced. There was no foundation laid for any of the video footage that was later introduced, so the protocols were not followed at that point in time. The use of that information for that impeachment, there had been no foundation set for those prior inconsistent statements, and that was simply improper at that point in time at the trial. What about the fact that, I'm sorry to jump in here, let's look back to my notes, but essentially in the report of the proceedings, the witness Gales contradicted, oh shoot, I can't read my own writing, how about that, contradicted his recorded statements, failed to recall certain statements, things of that nature. Sure, that's not the appropriate way the state should lay its foundation through questioning, but it's sort of there in that he didn't fully testify consistently how he had in the past. Right, sure, but even as you, Your Honor, identify yourself, it is only sort of there, and this protocol lays out something very specific that must be done here, and foundation that is sort of set is not the same as foundation that is fully set. But isn't that really for the court, that's for the court to make the determination as to whether or not it's appropriately reliable, and once the court's made that decision, that's really the purpose of the protocol, I suppose. Certainly, but at this point in time, all that was said was that there was video footage and that he said something different. There was no indication that it had been reliably recorded, there was no indication that that video footage was available to show the jurors at that point in time, so the foundation just simply wasn't set based on what the state said at that point. Excuse me, but the exhibit wasn't introduced then, there was no motion to introduce it then. Right, right, exactly. Well, I don't know, I think again, we're putting the cart before the horse, I guess, as I think, but I don't want to take time from your rebuttal arguments, so go ahead. Certainly, well, I, you know, again, it is our position that it would need to be, there would need to be that foundation first, and because video had not been moved to be introduced, it was not proper to impeach at that point in time. So, turning now to the video footage of Caban with the weapon and the rap music, the state brought up again that there would be perhaps information that was in that video footage that the jurors would not have otherwise heard, but the state is incorrect, because any commentary made during that footage, any showing of the gun, any comments about the model, that was all adduced through separate detective testimony, so again, there was no need to show this particular video footage to get that information out for the jury, and even the judge himself acknowledged, yeah, this could be prejudicial. So, not only does the judge say, yes, it can be prejudicial, there's also other means through which it can come through in trial, so there's simply no excuse for it coming through in this notably prejudicial fashion. And then, finally, in terms of the detective at the table, we would just note again that all other witnesses were subject to an exclusion order, so even if the jury said that they could be fair, they were presented with a situation where one witness was visibly associated with the entity. With that, I do see my time is up. Council, I'm sorry, I know you're trying to summarize, but could you address Chapman, our decision in Chapman? Certainly, certainly. Is there something particular you'd like me to address in it? Well, essentially, we acknowledge that other states allow for detectives, like inclined to be at the table, but Illinois has a well-settled precedent that it is allowed, which is maybe surprising authority, but it's problematic for your position, so I wonder how you wanted us to deal with that. Certainly. So, I think my response to that would be that we also need to look at the particular factual circumstances of this case itself, because in Chapman, while it is correct, like you say, that there was a holding that detectives in certain circumstances are allowed to sit at the table in the state of Illinois, Chapman does, in that opinion, the court references specifically a committee note in the analogous federal rule in coming to that decision, and that committee note talks about essentially the prerequisites to having a detective sit with the state, and again, the language used there is that it needs to be very important, and here, once again, the only thing that the state ever said was that it would be helpful, so yes, perhaps even if this court disagrees and thinks that this practice does not need to be banned altogether, let's say that there is an understanding that sometimes the detective should be allowed to sit with the state, even so, Chapman and the authorities that it lies on tend to indicate that there needs to be some showing beyond helpfulness, and that simply was not shown here. Thank you. Thank you, and with that, unless your honors have any further questions, we would ask that this court reverse and remand for a new trial. Thank you. Anything further, Justice Vancell? No, thank you. All right. Thank you very much, counsel. The court appreciates the arguments that were made this morning, and the court will take the matter under advisement and render a decision in due course. Again, thank you very much for your arguments this morning, and I know we had a lot of questions for you, but appreciate your attentiveness and your responsiveness. Thank you.